UNITED STATES of America, Appellee,

v.

David GUILLETTE and Robert
Joost, Appellants.

No. 1165, Docket 76–1041.

United States Court of Appeals,
Second Circuit.

Argued Aug. 18, 1976.

Decided Dec. 20, 1976.

Peter C. Dorsey, U. S. Atty., New Haven, Conn., Paul E. Coffey, Sp. Atty., Robert J. Erickson, Atty., Dept. of Justice, Washington, D. C., for appellee.

Hubert J. Santos, Sp. Public Defender, Hartford, Conn., for appellant David Guillette.

James A. Wade, Sp. Public Defender, Hartford, Conn., for appellant Robert Joost.

Before VAN GRAAFEILAND, Circuit Judge, and KELLEHER * and GAGLIARDI,** District Judges.

KELLEHER, District Judge.

Following a jury trial in the District Court of Connecticut, appellants David Guillette and Robert Joost were convicted of conspiracy to deprive a citizen of his civil rights in violation of 18 U.S.C. § 241 (1970). The jury also found Guillette guilty of using force to influence a federal witness in violation of 18 U.S.C. § 1503 (1970). The convictions result from a concerted government effort, spanning several years and involving numerous trials, to prosecute those persons responsible for the death of Daniel LaPolla, who was scheduled to be a key prosecution witness in a federal firearms case.

The events leading to appellants' conviction began in November 1971 with the burglary of a National Guard Armory in Westerly, Rhode Island, in which thirty automatic rifles were stolen. Two months later LaPolla approached federal agents who had been investigating the burglary and offered information on those responsible for the theft and the whereabouts of the rifles. Based on this and additional information obtained with the help of LaPolla, a Hartford federal grand jury indicted Guillette and Joost, together with William Marrapese and Nicholas Zinni, for interstate transportation of stolen firearms. LaPolla, named as an unindicted co-conspirator by the grand jury, was expected to offer vital testimony incriminating the four defendants in the break-in and subsequent efforts to find a buyer for the rifles. However, on September 29, 1972, just weeks before the firearms trial was to begin, the government lost its key witness when LaPolla was killed as a bomb exploded in his home in Oneco, Connecticut. Following an investigation of the bombing, a federal grand jury in Connecticut returned a three count indictment against Guillette, Joost, Marrapese and Zinni, charging them with conspiracy to deprive LaPolla of his civil rights, viz. the right to testify in a federal prosecution (18 U.S.C. § 241), obstruction of justice by force and violence (18 U.S.C. § 1503), and use of an explosive device in the commission of a felony (18 U.S.C. § 844(h)(1)). Thereafter the prosecution effort went through a series

* Of the Central District of California, sitting by designation.

** Of the Southern District of New York, sitting by designation.

of trials and mistrials, eventually culminating in the verdicts of guilty obtained against appellants in their third trial. Appellants' initial trial, which had been severed from that of the other defendants, resulted in guilty verdicts against both defendants on all counts, but the convictions were reversed and a new trial ordered after a key government witness, John Housand, recanted admittedly perjurious testimony he gave during the trial.

Prior to commencement of appellants' second trial, Marrapese, who had been convicted of all three counts in a separate trial, agreed to cooperate with the government and testify against his co-conspirators.[1] The second trial, however, resulted in no convictions; the jury acquitted Joost of counts 2 and 3 of the indictment and was unable to reach a verdict on the first count against him and on all three counts against Guillette.[2] At the third trial, with the aid of Marrapese's testimony, the government was successful in obtaining guilty verdicts against Guillette for conspiracy and obstruction of justice through use of force and a guilty verdict against Joost for conspiracy. Both defendants timely prosecuted this appeal of their respective convictions.

The evidence offered by Housand in the first trial and Marrapese in the second and third trials principally established the prosecution's version of the alleged conspiracy to silence LaPolla as a witness in the firearms prosecution. According to their testimony, the conspiracy commenced when Guillette and Joost, together with Marrapese, Bucci and Housand, met following their arrests for the theft of the automatic rifles to consider the upcoming prosecution (May 8 meeting). During the course of this meeting, Housand was offered $5,000 to kill LaPolla, who by this time had been earmarked by the group as an informant. Upon further reflection, however, the group thought it ill-advised to carry through with these plans until an assessment of the strengths of the government's case and defendants' chances for acquittal could be made. Thereafter the conspiracy evolved into a plan to find LaPolla and use bribery and physical coercion to dissuade him from testifying. Because LaPolla was being held in protective custody, however, Marrapese was unable to locate him for the purpose of effectuating the revised scheme.

After several months of futile searching had passed, according to Marrapese's testimony, Guillette informed him that unless LaPolla were found soon and persuaded to cooperate, they would have to "dump" him. Marrapese, Joost and Guillette subsequently intensified their search. They conducted continuous surveillance of LaPolla's home in Oneco, Connecticut, even to the point of hiring a pilot to fly aerial photo-reconnaissance over the house and surrounding area. To disguise the purpose of the flights, Guillette told the pilot that he was searching for a man in order to serve a summons on him. Later on Guillette and Joost, together with other members of the group, attended funeral services for LaPolla's brother in hopes of finding LaPolla present, but were turned away by federal agents. Finally, on September 29, the day of LaPolla's death, Guillette confided in Marrapese that he had "just left a package for your buddy up there." That afternoon LaPolla, ignoring instructions to stay away from his residence, drove home and leaving the car running in the driveway opened the front door of his house, touching off a massive explosion which killed LaPolla instantly.[3]

1. As a result of Marrapese's testimony before the grand jury after his cooperation with the government, Marrapese's lawyer, Andrew Bucci, was indicted as a co-conspirator in the scheme to deprive LaPolla of his civil rights.

2. Bucci was acquitted of the sole count against him and Zinni was acquitted of counts 2 and 3, with the jury unable to agree upon a verdict on the remaining count of conspiracy.

3. The fatal blast apparently was triggered by the opening of the front door which in turn caused a switch to close and detonate several sticks of dynamite. Government evidence at trial indicated the bomb probably was suspended at chest level with the switch located on the floor behind the front door. As the door was opened, the switch closed and completed the circuit to detonate the dynamite. Based on the damage to LaPolla's body, government experts

748

■ Appellants set forth numerous grounds for reversal of their convictions, but we find it necessary to address in detail only the more substantial questions. Initially, we note that appellants' contention that the trial court did not have jurisdiction to entertain the prosecution under 18 U.S.C. § 241 is without merit. Section 241 makes it a crime for two or more persons to conspire to "injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution . . . ." This Court in *United States v. Pacelli*, 491 F.2d 1108, 1113–15 (2d Cir. 1974), *cert. denied*, 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 49 (1974) held unequivocally that the right to be a witness in a federal trial is a civil right secured by the Constitution and protected from infringement or deprivation by § 241. Since appellants have presented nothing to this Court to indicate that *Pacelli* does not control the facts of the case at bar, we adhere to our holding in that decision and proceed to consider their other contentions.

### Jury Instructions

Appellants interpose three grounds of error with respect to jury instructions which were and were not given during trial: (1) the trial court erred in refusing to instruct the jury that if it found that LaPolla's death resulted from his accidental detonation of a bomb that he himself planted, it could not find the defendants guilty of a § 241 conspiracy with death resulting; (2) supplemental instructions did not properly advise the jury of the requisite elements of culpable participation in a conspiracy; and (3) the trial court erred in failing to give defendants' requested alibi instruction.

At all three trials appellants argued that LaPolla was killed when he accidentally detonated a bomb which he himself installed as a booby trap aimed at defendants and others who were searching for him. Rely-

ing upon this theory, appellants requested a jury instruction that if the jury were to find that the death was accidental or if the jury was not persuaded beyond a reasonable doubt that death was deliberate, defendants could not be found guilty of conspiracy with death resulting.[4] Section 241 provides that a sentence of life imprisonment may be imposed "if death results" from a prohibited conspiracy, whereas a simple conspiracy not resulting in death is punishable by a maximum term of ten years. Because both appellants received sentences of 25 years on their conspiracy convictions, the denial of the requested jury charge on accidental death played a significant role in the determination of their punishment and raises a substantial question concerning the scope of criminal culpability imposed by § 241.

The trial judge instructed the jury that even if LaPolla died accidentally through his own actions, the defendants would nonetheless be guilty of conspiracy with death resulting if LaPolla's death was "induced or brought about by some act of a conspiracy in furtherance of the purposes of a conspiracy." The crucial portion of the Court's instruction on the effect of accidental death follows:

Death results from the conspiracy charged in the indictment if it was caused by an act of one or more of the conspirators in furtherance of the purpose of the conspiracy.

Death, whether accidental or intentional, does not result from the conspiracy if caused by LaPolla's own act, unrelated to the conspiracy or its purposes provided the death was not induced or brought about by some act of a conspirator in furtherance of the purposes of the conspiracy. Likewise, death, whether accidental or intentional, does not result from the conspiracy if caused by the acts of any person who was not a member of the conspiracy or even if it were caused by a

concluded he was standing upright at the time of the blast.

4. In the second trial, the district judge did instruct the jury along these lines, stating that even though a conviction on conspiracy with

death resulting would be precluded by a finding that LaPolla died by his own hands, the jury nonetheless could convict for simple conspiracy.

member of the conspiracy but not in furtherance of its purpose or within the scope of the conspiracy.

A fundamental principle of criminal law is that a person is held responsible for all consequences proximately caused by his criminal conduct. The concept of proximate cause incorporates the notion that an accused may be charged with a criminal offense even though his acts were not the immediate cause of the victim's death or injury. *See generally* 40 C.J.S. Homicide § 11, at 854. In many situations giving rise to criminal liability, the death or injury is not directly caused by the acts of the defendant but rather results from intervening forces or events, such as negligent medical treatment, escape attempts, or the negligent or intentional acts of a third party. Where such intervening events are foreseeable and naturally result from a perpetrator's criminal conduct, the law considers the chain of legal causation unbroken and holds the perpetrator criminally responsible for the resulting harm. *See, e. g., State v. Schaub,* 231 Minn. 512, 44 N.W.2d 61, 63–64 (1950) (intervening act of third party); *People v. McGee,* 31 Cal.2d 229, 187 P.2d 706, 712–13 (1947) (negligent medical treatment); *Whiteside v. State,* 115 Tex.Cr. 274, 29 S.W.2d 399, 401–02 (Crim.App.1930) (escape attempt). This principle applies even where the direct cause of death is a force set in motion by the victim himself. For example, if a person acting on a well grounded and reasonable fear of death or bodily injury induced by an accused's threats or actual assaults, dies in an attempt to extricate himself from the danger, the accused bears criminal liability for the death. *See People v. Smith,* 56 Ill.2d 328, 307 N.E.2d 353, 355 (1974); *State v. Myers,* 7 N.J. 465, 81 A.2d 710, 715 (1951); *Whaley v. State,* 157 Fla. 593, 26 So.2d 656, 658 (1946). Thus under the common law even if LaPolla died from an explosion that he himself had accidentally caused, appellants would still be considered in the chain of legal causation if the immediate cause of death—setting a bomb as a booby trap— was a foreseeable protective reaction to

their criminal efforts to locate and dissuade him from testifying.

We find the principle of proximate cause embodied in § 241 through the phrase "if death results." Section 241 derives from one of the earliest pieces of civil rights legislation enacted by the Congress and was designed to protect persons in the free and uninhibited exercise of their individual liberties. Throughout its long history it has been invoked to redress infringements of such important constitutional rights as the right to vote, *Anderson v. United States,* 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974), the right to equality in public accommodations, *United States v. Johnson,* 390 U.S. 563, 88 S.Ct. 1231, 20 L.Ed.2d 132 (1968), the right to travel interstate, *United States v. Guest,* 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966), the rights secured by the Fourteenth Amendment, *United States v. Guest, supra; United States v. Price,* 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). Enacted as a purely criminal statutory provision, its purpose would be frustrated by any artificial restrictions placed on its scope. When the Congress provided that a conspiracy to violate a citizen's civil rights may be punished by life imprisonment if death results, we must consider it to have been fully cognizant of the principles of legal causation discussed above. The accepted practice among federal courts in construing a federal criminal statute which uses a common law term without defining it is to give the term its common law meaning. *See United States v. Turley,* 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957); *United States v. Bell,* 505 F.2d 539 (7th Cir. 1974), *cert. denied,* 420 U.S. 964, 95 S.Ct. 1357, 43 L.Ed.2d 442 (1975). To confine the meaning of "result" to direct causation not only would be at odds with common law principles of legal causation but also would seriously impair the effectiveness of § 241. The more severe punishment prescribed for those conspiracies resulting in death was designed to deter the type of conduct that creates a risk of loss of life or serious bodily injury. Construing the statute as requiring only direct causation would merely encourage those

bent on depriving others of their constitutional rights to devise roundabout but potentially dangerous means of achieving their ends. Consequently, appellants were not entitled to their requested jury charge, and the one given by the trial judge, considered in its entirety, was sufficient to convey to the jury the legal principles governing the offense charged.

 With respect to the trial court's supplemental instruction to the jury on the requisite elements of culpable participation in a conspiracy, appellants complain that the instruction failed properly to advise the jury that mere knowledge of or acquiescence in the conspiracy is not a sufficient basis for a finding of guilt. In considering objections of this sort, appellate courts must view the contested jury instructions in

the context of the total charge; isolated improper comments by the trial judge do not compel reversal if the instruction is otherwise correct and nonprejudicial. *See Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *United States v. Malizia,* 503 F.2d 578, 583 (2d Cir. 1974), *cert. denied,* 420 U.S. 912, 95 S.Ct. 834, 42 L.Ed.2d 843 (1975). Having reviewed the supplemental instruction as well as the main charge on participation in a conspiracy,[5] we are convinced the jury was properly informed that it could not consider appellants members of the conspiracy unless it found that they affirmatively joined it and promoted its objectives. In response to the jury's request for a clarification of the elements of culpable participation in a conspiracy, the trial court noted a co-con-

5. The Court instructed the jury in its main charge on participation in the conspiracy as follows:

Now, when I say joined the conspiracy, I do not mean that he has to file some kind of a formal application for membership or that he has to sit down with others and agree in so many words, "Count me in," but before one can be found to be a conspirator, he must know of the existence of the conspiracy and of its purpose, and he must voluntarily and knowingly join with others in a common plan and with an intent to promote its unlawful purpose. Here the defendant whom you are considering must intend to join with others in a common plan to deprive LaPolla of his right and privilege to give information to the authorities about violations of the gun control laws or to harm him because he had testified before a grand jury or to silence him from testifying in the approaching trial of the M–16 case.

Now, the mere fact that a defendant may know that others have formed a conspiracy or be present when other people were talking about the conspiracy or have a friendship, an employment or association or any kind of business relationship with another member of the conspiracy is not in itself enough to make him a conspirator unless you first find that he knew of the existence of the conspiracy and of its purpose, and voluntarily and knowingly joined with others in a common plan with an intent to promote its unlawful purpose.

This charge was supplemented with the following in response to an inquiry from the jury:

(B)efore he can be found to be a member of the conspiracy, he must know that others have formed a conspiracy. In other words,

he must know that two or more people have combined to commit a crime and then before you can find him a member, he must get in on that arrangement. He may do that by the wink of an eye. I don't know. That is for you to decide. Did he become a party to it? Did he join in on it? And did he do so with an intent to promote its unlawful purpose?

As I told you, you must find that there is an assent by anyone in order to find that he has become a member. You must find that he assents to this. And as I told you in the main charge, he doesn't have to say in so many words "Count me in." And as I told you a moment ago, it may be just the wink of an eye. We all have little conspiracies in our lives. Husbands and wives have them, you have them with your children. You are going to buy your wife a present, your daughter knows about it and it's a little conspiracy you have and winks of an eye or a smile show that you have a common understanding. So here there must be an assent on his part to join in this, that he is in on it, that he is part of this arrangement, that he adopts this plan as his own and that he is going to promote it, to promote it as his own and that he has a stake in its outcome. I think you should, therefore, consider all of this evidence. It isn't just this conversation. That is part of it. It's that conversation plus the entire context of circumstances known to those participants at that time. These words, like any other words, take on their meaning only in the context of the whole circumstances. Just as a word in a sentence means nothing unless you look at all the other words in the sentence or in the paragraph or sometimes in the whole book.

spirator "must in some way indicate or show that he is going along with this (conspiracy), that he is in on it, that he is a part of this arrangement, that he adopts this plan as his own and that he is going to promote it . . . as his own, and that he has a stake in its outcome." This charge more than adequately conveyed to the jury that mere knowledge is not sufficient, that before it could find either of the appellants a member of the conspiracy it must be convinced of his affirmative embracing of the unlawful objectives and his intent to achieve those objectives.

At trial both Guillette and Joost specifically denied that they were present at the crucial May 8 meeting at which the plan to kill LaPolla purportedly was devised and introduced testimony of a number of alibi witnesses to corroborate their stories. Based on this evidence, they jointly requested that the jury be instructed to return a verdict of not guilty on the conspiracy count if the jurors had a reasonable doubt as to whether appellants did attend the meeting.[6] Appellants now contend the trial court's failure to so instruct was reversible error.

The May 8 meeting unquestionably was an important element in the prosecution's case, and the alibi testimony offered by Joost and Guillette cast genuine doubt on the credibility of Marrapese, who was the sole witness testifying to appellants' presence at the meeting. However, appellants were convicted of a conspiracy which encompassed several months and numerous acts undertaken to further its unlawful end, of which the May 8 meeting was only one. The gist of a conspiracy is an agreement among conspirators to commit an offense accompanied by an overt act in furtherance of its purpose. *United States v. Falcone,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). A defendant need not be a member of the conspiracy from its inception but may join later and incur liability for the conspiracy's unlawful acts committed both before and after his adoption of the conspiracy. *See United States v. Dardi,* 330 F.2d 316 (2d Cir.), *cert. denied,* 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964). Thus even if the jury did not believe Marrapese's testimony that Guillette and Joost were present at the May 8 meeting, there was other evidence sufficient to support a finding of appellants' membership in the conspiracy.[7]

Appellants place great reliance on this Court's recent decision in *United States v. Burse,* 531 F.2d 1151 (2d Cir. 1976), which considered the proper instruction to a jury on an alibi defense in a conspiracy prosecution, but a close reading of that opinion reveals that the reliance is misplaced. In that decision we held that failure to caution a jury against considering disbelieved alibi testimony as evidence of a defendant's guilt constituted reversible error where such an instruction was requested, and the evidence against the defendant was not overwhelming, and the prosecution's conspiracy theory rested heavily on defendant's presence at

---

**6.** Appellants requested the following instruction on an alibi defense:

Evidence has been introduced by some of the defendants to show that on the morning of May 8, 1972, they were at a location other than Carter's jewelry store. Guillette testified he was at the home of his brother-in-law, and Joost testified he was at his own home. I remind you that a defendant never has the burden of proving his innocence. If, after considering all of the evidence, you have a reasonable doubt as to whether a defendant was at the meeting at Carter's jewelry store on May 8, you must find that defendant not guilty of Count One, and you would not be able to use the joint venture or conspiracy theory in convicting that defendant on Counts Two or Three.

**7.** Aside from the May 8 meeting, the record reveals other evidence of Guillette's and Joost's participation in the conspiracy. Marrapese testified that on September 7 he and Joost staked out LaPolla's home and conducted surveillance of it for almost a full day until frightened off by federal agents. Later on Guillette flew on an aerial reconnaissance flight over LaPolla's home in hopes of finding clues of LaPolla's whereabouts while Joost conduct a coordinated ground surveillance. Both appellants appeared at the wake of LaPolla's brother and were later seen on the morning of the funeral walking around the cemetery where the burial was to take place. Finally, on the day of LaPolla's death, Guillette confided in Marrapese that he had just been to LaPolla's home and had "left a package" there.

the scene of the substantive crime. In so holding the Court sought to safeguard defendants from a danger likely to arise when jurors, untrained in the law, disbelieve alibi testimony and are inclined to view the failure of the defense as a sign of the defendant's guilt.

The instruction requested by appellants in the case at bar, however, differs in a significant respect from the one we thought appropriate in *Burse*. The charge sought by appellants, while reminding the jury of the government's burden in light of the alibi defense, principally advanced the proposition that the jury must return a verdict of not guilty on the conspiracy charge if it was not convinced beyond a reasonable doubt that Guillette and Joost attended the May 8 meeting. As noted earlier, since the offense charged was conspiracy, the government was not required to prove appellants' attendance at the May 8 meeting beyond a reasonable doubt and thus the trial court did not err in refusing to so instruct the jury. The alibi, if believed by the jury, established no more than that appellants did not participate in one of numerous overt acts of the conspiracy.

■■■ In light of the misleading alibi instruction proposed by appellants and the other evidence on the record indicating their participation in the conspiracy, we view the trial court's failure to caution the jury on the government's unchanging burden of proof as harmless error. The requested instruction was neither in writing nor a proper statement of the controlling law. *See United States v. Coughlin*, 514 F.2d 904, 907 (2d Cir. 1975). The alibi testimony itself, the reliability of which was subject to some doubt,[8] was less than overwhelming in comparison to Marrapese's account, and the jury was thoroughly instructed that the government must establish every element of the crime beyond a reasonable doubt. *See United States v. Cole*, 453 F.2d 902, 906 (8th Cir. 1972);

*United States v. Erlenbaugh*, 452 F.2d 967, 975 (7th Cir. 1971), *aff'd on other grounds*, 409 U.S. 239, 93 S.Ct. 477, 34 L.Ed.2d 446 (1972). Moreover, attendance at the May 8 meeting was not an essential element of the crime, and thus an alibi would not have been a total defense. *See United States v. Lee*, 483 F.2d 968, 970 (5th Cir. 1973).

## Validity of Indictment

The indictment returned against the appellants in June of 1973 was based in substantial part on the testimony of John Housand, the government's key witness in the first trial. After Housand admitted giving false testimony during the trial with respect to psychiatric treatment he had received in the past, the convictions resulting from the first trial were vacated and a new trial ordered, but the original indictment was left undisturbed. Appellants contend that the prosecutor was under a duty to seek a new indictment untainted by Housand's testimony and that his failure to do so is cause for dismissal.

■■■ An indictment returned by a legally constituted and unbiased grand jury generally is not subject to attack on the ground that it is based on inadequate or incompetent evidence. *United States v. Calandra*, 414 U.S. 338, 345, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 391 (1956). The government, however, is subject to certain restrictions on its relationship with the grand jury and the type of evidence it may present to obtain an indictment. *See United States v. Basurto*, 497 F.2d 781, 785–86 (9th Cir. 1974); *United States v. Gallo*, 394 F.Supp. 310, 315 (D.Conn.1975). For example, where the government knows that perjured testimony has been given to the grand jury and that this testimony is material to the grand jury's deliberations, due process requires that the prosecutor take such steps as are

---

8. The May 8 meeting at Carter's Jewelry purportedly took place between 8:00 and 10:00 a.m. Guillette's alibi evidence consisted of the testimony of his brother-in-law that he picked up Guillette and his wife around 1:00 p.m. on the 8th and drove them to a doctor's appointment and the testimony of Guillette's wife that Guillette was in bed at the time of the meeting. Joost's alibi rested on his own testimony that he was home at the time of the meeting.

necessary to correct any possible injustice. *United States v. Basurto, supra.* Where jeopardy has not yet attached, it generally is proper for the prosecutor to return to the grand jury and seek a new indictment untainted by the perjury.

Application of these principles to the facts of the case at bar, however, convinces us that the trial court did not err in refusing to dismiss the original indictment. Housand perjured himself during the first trial in denying ever having received psychiatric treatment or using certain aliases, but these issues were never explored in his testimony before the grand jury. There is no evidence therefore that Housand actually committed perjury during his grand jury appearance. The only plausible effect Housand's recantation could have had on his grand jury testimony would have been to undermine its credibility, but we decline to adopt the proposition that grand jury testimony that has merely been thrown open to suspicion by postindictment events is an invalid basis for an indictment. Such a rule of law would necessitate independent judicial review of the credibility of grand jury witnesses, an exercise that would seriously infringe upon the traditional independence of the grand jury. We consequently hold that where subsequent events merely cast doubt on the credibility of grand jury witnesses, due process does not require the prosecution to notify the grand jury of those events and seek a new indictment.

Appellants also urge that the government's failure to turn over material discoverable under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) constituted such prosecutorial misconduct as to invoke the Double Jeopardy Clause's prohibition against retrial. While the Fifth Amendment's protection against double jeopardy does bar reprosecution where a mistrial has been declared because of prosecutorial misconduct, *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 1081–82, 47 L.Ed.2d 267 (1976), the proper remedy for alleged government improprieties in cases resulting in verdicts of guilty is to vacate the conviction and order a new trial. That

is precisely the action taken by the trial court after finding that Housand had perjured himself and the government had not produced all required *Brady* material. The Double Jeopardy Clause clearly does not bar the government from choosing to reprosecute after a conviction has been overturned because of prejudicial error.

Certainly it is clear beyond question that the Double Jeopardy Clause does not guarantee a defendant that the Government will be prepared, in all circumstances, to vindicate the social interest in law enforcement through the vehicle of a single proceeding for a given offense. Thus, for example, reprosecution for the same offense is permitted where the defendant wins a reversal on appeal of a conviction. *United States v. Ball,* 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896); see *Green v. United States,* 355 U.S. 184, 189, 78 S.Ct. 221, 224, 2 L.Ed.2d 199 (1957). The determination to allow reprosecution in these circumstances reflects the judgment that the defendant's double jeopardy interests, however defined, do not go so far as to compel society to so mobilize its decisionmaking resources that it will be prepared to assure the defendant a single proceeding free from harmful governmental or judicial error.

*United States v. Jorn,* 400 U.S. 470, 483–84, 91 S.Ct. 547, 556, 27 L.Ed.2d 543 (1971); see *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 1081 & n.13, 47 L.Ed.2d 267 (1976).

### Exclusion of Souca Confession

The trial court refused to admit testimony of a government informant that he had been told by one Anthony Souca that he was the one who killed LaPolla. Despite considerable efforts, the government was not able to locate Souca in order to verify the informant's account. Appellants argue that the trial court committed prejudicial error in refusing to order the prosecution to produce the informant for the purpose of offering trial testimony on Souca's alleged confession or at least to admit into evidence the transcript of an earlier *in camera* exam-

ination of the informant in which details of the confession were given.

■ The admissibility into evidence of hearsay statements against penal interest is controlled by Federal Rule of Evidence 804(b)(3) which was in effect at the time of trial. Rule 804(b)(3), in providing that "a statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement," significantly departs from a prior rule in the federal system barring the use of such hearsay declarations that had stood since its inception in *Donnelly v. United States,* 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913). The significant change, of course, is that now declarations against penal interest are deemed an exception to the hearsay rule and subject to admission as such if there is sufficient corroborating evidence to indicate their trustworthiness. The requirement of corroboration was written into the Rule to guard against the inherent danger that third party confessions tending to exculpate a defendant are the result of fabrication. *See* Advisory Comm. Notes, Fed.R.Evid. 804(b)(3). And the possibility of fabrication, of course, is only enhanced when the hearsay declarant is not available for examination at the trial.

■ The determination whether corroborating circumstances clearly indicate the trustworthiness of a third party confession lies within the sound discretion of the trial court, which is aptly situated to weigh the reliability of the circumstances surrounding the declaration, and this Court will review the exclusion of the Souca confession only for an abuse of discretion. To guide our review we turn to the Supreme Court's decision in *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1975), which sets forth four general considerations relevant to an investigation of the trustworthiness of third party confessions. 410 U.S. at 300–01, 93 S.Ct. 1038.

(1) the time of the declaration and the party to whom the declaration was made.

(2) the existence of corroborating evidence in the case.

(3) the extent to which the declaration is really against the declarant's penal interest.

(4) the availability of the declarant as a witness.

*See also United States v. Wingate,* 520 F.2d 309, 316 (2d Cir. 1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976). While these considerations are not exhaustive and absolute, they do suggest the nature of an appropriate inquiry by a district court faced with the proffer of a third party confession. Considering the circumstances of Souca's declaration, we are of the view that the trial court did not abuse its discretion in refusing to admit any evidence of the confession. Souca made his incriminating statement some four months after LaPolla's death and to a police informant whom he had just met. By contrast, the declarant in *Chambers* confided in several friends shortly after the murder for which he claimed responsibility. Moreover, Souca made his confession while drinking with the informant, and evidence that Souca had had a number of drinks casts additional doubt on the reliability of his declaration. *See United States v. Sheard,* 154 U.S.App.D.C. 9, 473 F.2d 139, 149 (D.C.Cir.1972), *cert. denied,* 412 U.S. 943, 93 S.Ct. 2784, 37 L.Ed.2d 404 (1973). Souca's account also lacks any significant corroborating evidence. Although there apparently exists in the general vicinity of the alleged meeting a bar fitting the description given by the informant, the record in the case at bar reveals no independent evidence tying Souca to LaPolla's murder, such as reports of eye witnesses placing him in the vicinity of LaPolla's home at the time of the bombing or evidence of efforts to locate LaPolla while he was being held in protective custody. Finally, we note that the government was unable to find Souca and bring him to trial to testify concerning his alleged confession, thus depriving the prosecution of an opportunity to cross-examine him and depriving the jury of the opportunity to view his demeanor and weigh his responses.

*See Chambers v. Mississippi,* 410 U.S. at 301, 93 S.Ct. at 1048. Under these circumstances, it was within the trial court's discretion to exclude the informant's testimony.

### Denial of Severance

Joinder of two defendants in the same prosecution may be prejudicial if hearsay statements of one defendant, admitted into evidence without an opportunity for cross-examination, inculpate the other codefendant. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Joost complains that the admission into evidence of two post-conspiratorial hearsay statements by Guillette—a statement made to Marrapese about nine months after LaPolla's death acknowledging responsibility for it and a request by Guillette to the pilot hired to fly the reconnaissance over LaPolla's home not to disclose any details of the flights—had a spillover effect on him and constituted grounds for severance of his trial from Guillette's. The rule enunciated by the Supreme Court in *Bruton,* however, has no application where the "hearsay utterances of a defendant . . . do not inculpate a codefendant." *United States v. Lobo,* 516 F.2d 883 (2d Cir. 1975), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975). It is clear that Guillette's "confession" did not inculpate Joost in the murder of LaPolla; the statement made no mention of Joost nor even suggested Joost's participation in the murder plot. In such a situation, *Bruton* did not require severance of the charges against appellants.

While post-conspiratorial utterances of a co-conspirator may not be used to establish the culpability of other co-conspirators, *Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), such statements are admissible against the declarant provided proper cautionary instructions are given to the jury. *See Lutwak v. United States,* 344 U.S. 604, 618, 73 S.Ct. 481, 97 L.Ed. 593 (1953). In admitting Guillette's hearsay statements, the trial court properly instructed the jury that the statements could be considered only as evidence against Guillette, and this caution was repeated in the Court's final charge to the jury. We find that these limiting instructions were sufficient to protect Joost from any adverse effects of the admission of Guillette's declarations, particularly in light of the improbability that the statements could be construed as incriminating Joost in any way.

We have reviewed appellants' remaining contentions and find them to be without merit. The doctrines of collateral estoppel and double jeopardy do not bar the trial and conviction of Joost for conspiracy with death resulting in violation of § 241. This is so even though he was acquitted at the second trial on the substantive counts of intimidating a witness by force and violence and using a dynamite bomb to commit a felony. Despite the acquittals on the substantive charges and the finding that Joost had no culpable participation in the actual bombing, the jury was free to find that Joost was an active member of the conspiracy which resulted in LaPolla's death. Double jeopardy bars only relitigation of those issues of fact that were "necessarily . . . determined in favor of the defendant by a valid and final judgment in a prior proceeding." *United States v. Cala,* 521 F.2d 605, 607–08 (2d Cir. 1975). Joost has failed to sustain his burden of showing that elements essential to his conviction of conspiracy with death resulting were foreclosed from jury consideration by his prior acquittal. With respect to appellants' contention that the district court abused its discretion in limiting the cross-examination of Marrapese, we note merely that a trial judge had broad discretion to control the scope and length of cross-examination; the exercise of this discretion below did not constitute abuse. Finally, having reviewed the record in its entirety and considering the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we find that it is sufficient to sus-

tain the jury's determination of guilt with respect to both appellants.

Affirmed.